___ FILED ___ ENTERED
___ LODGED ___ RECEIVED

MAY 17 2013

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                              DEPUTY

Judge Mary Alice Theiler

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| UNITED STATES OF AMERICA, | NO. MJ13-260 |
|---|---|
| Plaintiff | COMPLAINT FOR VIOLATION |
| v. | |
| GREG ALAN CARROLL, JOHN CHRISTIAN PARKS, and JOSHUA DEE CARROLL, Defendants. | |

BEFORE, MARY ALICE THEILER, United States Magistrate Judge, U. S. Courthouse, Seattle, Washington.

The undersigned complainant being duly sworn states:

## COUNT 1
### (Felon in Possession of Firearms)

On or about March 30, 2013, in the Mt. Baker-Snoqualmie National Forest, within the Western District of Washington, GREG ALAN CARROLL, having previously been convicted of the following crimes punishable by imprisonment for a term exceeding one year:

COMPLAINT / CARROLL, et al. - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a. *Violation of the Uniform Controlled Substances Act*, under cause number 07-1-07802-5, in King County Superior Court, Washington, on December 16, 2008;

b. *Assault in the Third Degree*, under cause number 05-1-01431-0, in Pierce County Superior Court, Washington, on September 1, 2005; and

c. *Unlawful Possession of a Firearm in the Second Degree*, under cause number 05-1-01431-0, in Pierce County Superior Court, Washington, on September 1, 2005;

did knowingly possess, in and affecting interstate and foreign commerce, firearms, to wit:

a. A Norinco SKS 7.62 mm assault rifle;
b. A Hi-Point C9 9mm semi-automatic pistol;
c. A Mauser 98 8mm rifle;
d. A Sig Sauer .223 caliber assault rifle;
e. A Smith & Wesson M&P 10 7.62mm assault rifle;
f. A Smith & Wesson M&P 15 5.56mm NATO assault rifle;
g. A Taurus .45 ACP semi-automatic pistol; and
h. A Taurus .45/410 caliber revolver,

each of which had been transported in interstate or foreign commerce.

All in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

## COUNT 2
### (Felon in Possession of Firearms - Armed Career Criminal)

On or about March 30, 2013, in the Mt. Baker-Snoqualmie National Forest, within the Western District of Washington, JOHN CHRISTIAN PARKS, having previously been convicted of the following crimes punishable by imprisonment for a term exceeding one year:

a. *Violation of the Uniform Controlled Substances Act – Possession*, under cause number 03-1-03013-5, in King County Superior Court, Washington, on May 21, 2004;

b. *Escape in the Second Degree*, under cause number 04-1-12909-1, in King County Superior Court, Washington, on December 20, 2004;

c. *Violation of the Uniform Controlled Substances Act – Manufacture, Deliver, Possession with Intent*, under cause number 01-1-06630-9, in Pierce County Superior Court, Washington, on May 17, 2005;

d. *Violation of the Uniform Controlled Substances Act – Possession*, under cause number 01-1-00040-9, in Jefferson County Superior Court, Washington, on May 4, 2001;

e. *Violation of the Uniform Controlled Substances Act – Possession*, under cause number 01-1-04671-0, in King County Superior Court, Washington, on September 28, 2001;

f. *Violation of the Uniform Controlled Substances Act – Possession*, under cause number 00-1-00477-2, in Grant County Superior Court, Washington, on February 6, 2001;

g. *Violation of the Uniform Controlled Substances Act – Manufacture, Deliver, Possession with Intent*, under cause number 97-1-00284-1, in Clallam Couinty Superior Court, Washington, on April 2, 1998; and

h. *Violation of the Uniform Controlled Substances Act – Possession with Intent*, under cause number 97-1-00284-1, in Clallam Couinty Superior Court, Washington, on April 2, 1998;

did knowingly possess, in and affecting interstate and foreign commerce, firearms, to wit:

a. A Norinco SKS 7.62 mm assault rifle;

b. A Hi-Point C9 9mm semi-automatic pistol;

c. A Mauser 98 8mm rifle;

d. A Sig Sauer .223 caliber assault rifle;

  e. A Smith & Wesson M&P 10 7.62mm assault rifle;
  f. A Smith &Wesson M&P 15 5.56mm NATO assault rifle;
  g. A Taurus .45 ACP semi-automatic pistol; and
  h. A Taurus .45/410 caliber revolver,
each of which had been transported in interstate or foreign commerce.

  All in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e).

## COUNT 3
### (Felon in Possession Firearms)

  On or about March 30, 2013, in the Mt. Baker-Snoqualmie National Forest, within the Western District of Washington, JOSHUA DEE CARROLL, having previously been convicted of the following crimes punishable by imprisonment for a term exceeding one year:

  a. *Assault in the Third Degree*, under cause number 09-1-05462-9, in King County Superior Court, Washington, on November 2, 2009;

did knowingly possess, in and affecting interstate and foreign commerce, firearms, to wit:

  a. A Norinco SKS 7.62 mm assault rifle;
  b. A Hi-Point C9 9mm semi-automatic pistol;
  c. A Mauser 98 8mm rifle;
  d. A Sig Sauer .223 caliber assault rifle;
  e. A Smith & Wesson M&P 10 7.62mm assault rifle;
  f. A Smith &Wesson M&P 15 5.56mm NATO assault rifle;
  g. A Taurus .45 ACP semi-automatic pistol; and
  h. A Taurus .45/410 caliber revolver,
each of which had been transported in interstate or foreign commerce.

  All in violation of Title 18, United States Code, Section 922(g)(1) and 924(a)(2).

## COUNT 4
### (Felon in Possession of Firearms)

On or about April 8, 2013, in Burien, within the Western District of Washington, GREG ALAN CARROLL, having previously been convicted of the following crimes punishable by imprisonment for a term exceeding one year:

a. *Violation of the Uniform Controlled Substances Act*, under cause number 07-1-07802-5, in King County Superior Court, Washington, on December 16, 2008;

b. *Assault in the Third Degree*, under cause number 05-1-01431-0, in Pierce County Superior Court, Washington, on September 1, 2005; and

c. *Unlawful Possession of a Firearm in the Second Degree*, under cause number 05-1-01431-0, in Pierce County Superior Court, Washington, on September 1, 2005;

did knowingly possess, in and affecting interstate and foreign commerce, firearms, to wit:

a. A Marlin .22 Winchester Magnum caliber bolt action rifle;

b. A Remington .22 caliber semi-automatic rifle;

c. A Rock Island Arsenal .30 caliber rifle;

d. A Savage Arms 12 gauge shotgun;

e. A Stevens 12 gauge double barrel shotgun with a 15 ½" barrel length;

f. A Remington auto loading shotgun with a 15 ¾" barrel length;

g. A Harrington and Richardson .410 gauge, single shot; shotgun with a 9 ¾" barrel length;

h. A Iver Johnson single shot shotgun with a 10 7/16" barrel length; and

i. A Browning .22 caliber lever action rifle,

each of which had been transported in interstate or foreign commerce.

All in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

The undersigned complainant, RYAN J. KOWALCHUK, being first duly sworn on oath, depose and say:

## INTRODUCTION

1. I am currently employed by the Washington State Department of Corrections as a Community Corrections Specialist. My current job assignment is as a Task Force Officer (TFO) with the Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives. I started as a TFO in November of 2008. During my career as a TFO, I have been involved in numerous investigations, involving the unlawful purchase and/or unlawful possession of firearms and the illegal use of firearms during crimes of violence and/or drug trafficking. I have participated in the execution of search and arrest warrants in support of these investigations. Prior to becoming a TFO, I was employed as a Community Corrections Officer with the Washington State Department of Corrections since May of 2004. Before that, I started my career in law enforcement as a Police Officer in King City, Oregon in April of 2000. I was responsible for all aspects of police patrol to include: responding to burglaries, bank robberies, domestic violence, assaults in progress, other 911 calls for assistance, and conducting follow-up investigations. I also have received a Bachelor of Arts degree in Criminal Justice from Washington State University, Pullman in December of 1998.

## SUMMARY OF PROBABLE CAUSE

2. This Complaint relates to two separate incidents, both of which involve GREG ALAN CARROLL (hereinafter CARROLL), and one of which involves JOHN CHRISTIAN PARKS and JOSHUA DEE CARROLL (hereinafter JOSHUA). Both incidents are detailed more fully below, but because I submit this Complaint for the limited purpose of establishing probable cause for the arrests of CARROLL, PARKS, and JOSHUA, this Complaint does not contain all the facts known to me regarding the investigation.

## THE INCIDENT AT THE NATIONAL FOREST

3. The information regarding this incident has been primarily relayed to me by Jeff McIntosh, a Patrol Officer of the United States Department of Agriculture - Forest

Service. Officer McIntosh serves in the Snoqualmie Ranger District in North Bend, Washington. Officer McIntosh has been in this position since July, 2007, and his duties include law enforcement program management, crime prevention and police and medical/rescue services for over 350,000 acres of urban-interface National Forest. He also conducts front and back country patrols, respond to 911 calls for service and investigates both felony and misdemeanor crimes. From January 2004 to July 2007, he served as a Border Patrol Agent with the Department of Homeland Security in Tucson, Arizona where his primary task was to detect, deter and prevent the smuggling and unlawful entry of undocumented aliens, narcotics and other contraband into the United States and to apprehend those persons found in the United States in violation of immigration and federal law.

4.      On Saturday, March 30th, 2013 Officer Ed King and Officer McIntosh were conducting an area check along National Forest System (NFS) Road 9020 inside the Mt. Baker-Snoqualmie National Forest, Snoqualmie Ranger District in the Western District of Washington.

5.      At approximately 1745 hours, while contacting other individuals regarding their potential violations related to vehicle regulations, the officers heard gunshots in the distance. The individuals with whom Officer King and Officer McIntosh were speaking indicated that there were target shooters up the road who had been unfriendly to them, and suggested that they be contacted.

6.      The officers drove up the road, and parked, eventually walking up a hill within the National Forest. About 50 meters up the hill, they saw a dark green GMC Yukon (WA/ACT1661) parked under high-voltage wires. Officer McIntosh saw a white male in a black Mariners baseball hat and another heavy-set, older white male in a grey-tan ball cap. Officer McIntosh observed the older, heavy-set man in the grey-tan ball cap discharge a long gun in the direction of an area where Officer McIntosh knew there to be no suitable backstop, which is a violation of National Forest service regulations related to discharging firearms in a manner that does not expose people or property to injury or

1  damage. This man was later identified as GREG CARROLL. The long gun appeared to
2  be an SKS style assault rifle. As CARROLL discharged the long gun, Officer McIntosh
3  observed a plume of white/grey smoke come from the down range area of where
4  CARROLL had shot. This caused Officer McIntosh to suspect that CARROLL had shot
5  at an exploding target.

6.      7.      The officers returned to their patrol vehicle and drove back up the hill. As
7  they approached the target shooting group, Officer McIntosh observed several men
8  huddled around the back of a black Ford Ranger pickup (WA/B86475N), which was just
9  a few yards away from the previously-described GMC Yukon. Using his patrol vehicle's
10 public address system, he ordered all the men away from the pickup and to keep their
11 hands where he could see them. One of the men was wearing military-style fatigues. His
12 outfit included a digital woodland (MARPAT) camouflage "boonie" style hat, an olive
13 drab green battle dress uniform (BDU) top, olive drab green BDU pants and olive drab
14 green bloused boots. This man was later identified as JOHN PARKS. Officer McIntosh
15 had to instruct PARKS a second time to take his hands out of his pockets. He ordered the
16 men to stand away from both the GMC Yukon and the Ford Ranger, where weapons were
17 present.

18      8.      On the open tailgate of the Yukon, Officer McIntosh saw a Smith and
19 Wesson M&P 10 7.62mm assault rifle and a Smith and Wesson M&P 15 5.56mm NATO
20 assault rifle. For officer safety reasons, he manipulated both weapons and insured that
21 they were unloaded. On the open tailgate of the Ranger, he observed a Taurus .45 ACP
22 semi-automatic pistol and a Taurus .45/.410 caliber revolver. The Taurus revolver was in
23 a holster. He removed the revolver from the holster and ensured that it was unloaded.

24      9.      Officer McIntosh walked back over to the group and began to speak with
25 them about their target shooting activities. Believing that they were shooting in an

26
27
28

unauthorized area of the forest, Officer McIntosh told the men that they were doing so.[1] He then asked them what they were shooting at. The men stated that they were shooting at a paper target, which was affixed to a wooden post. They also explained that they were shooting at a tree. Officer McIntosh observed a paper target, which had been affixed to a tree approximately 20 meters away from where the vehicles were parked. Shooting at trees is a violation of Forest Service regulations, because it damages trees. Officer McIntosh explained this to the men, and PARKS stated that they had gone down range of the tree to ensure that there was nobody back there.

10.   Officer McIntosh requested identification from all five of the men in the group. Three of the men provided him with identification, but CARROLL and PARKS did not. He asked the men if "the law was looking" for any of them. All the men responded in the negative. CARROLL appeared sheepish and uneasy when answering this question. Officer McIntosh was able to positively identify CARROLL and PARKS based on the names, middle initials, and dates of birth they provided to him. JOSHUA was one of the three men who provided Officer McIntosh with identification.

11.   Officer McIntosh requested checks on CARROLL and PARKS through Washington State Patrol (WSP) Dispatch. WSP notified Officer McIntosh that CARROLL was a convicted felon and had a felony Washington Department of Corrections (DOC) escape warrant for his arrest. WSP notified him that PARKS was also a convicted felon.

12.   After learning this information, Officer McIntosh summoned CARROLL over to him and placed him in metal restraints. He did the same with PARKS, who questioned why he was being arrested. The officer informed PARKS that it was because he was a convicted felon and in possession of firearms. PARKS denied possessing any firearms.

---

[1] Officer McIntosh later determined that the men were about 25 meters away from a no-shooting area, but nonetheless were in violation of more than one other Forest Service regulation, based on what Officer McIntosh had witnessed.

COMPLAINT / CARROLL, et al. - 9

13. Officer McIntosh requested checks through WSP on the remaining three individuals. WSP advised that JOSHUA was a convicted felon and that another man with the group was a respondent in a protection order with "Brady" restrictions. The fifth man did not have any apparent firearm restrictions, based on the report from WSP Dispatch.

14. Officer McIntosh called a King County Sheriff's Deputy for back up. He then individually spoke with the three men who were not under arrest, reading JOSHUA his *Miranda* rights. JOSHUA initially denied possessing or shooting the firearms, but then later admitted to doing both and confirmed that both CARROLL and PARKS had possessed and shot the firearms as well. The other two men at the scene denied that CARROLL and PARKS had possessed the firearms.

15. While standing near the front of his patrol car, out of the corner of his eye, Officer McIntosh observed PARKS make a quick furtive movement. As he was doing so, the officer heard the distinct clinking sound of an object hitting the ground. He inspected the area immediately adjacent to PARKS and discovered a small glass pipe consistent with pipes that he knew, from his training and experience, are used to smoke methamphetamine. PARKS denied that he had just attempted to discard the pipe.

16. Approximately 15 meters to the east of the Yukon, Officer McIntosh discovered a plastic container, which was labeled "Star Targets." The container held a Tannerite-like substance, which when mixed with a catalyst, will explode when shot. According to Officer McIntosh, these "exploding targets" are becoming increasingly popular amongst target shooters. The location of the Tannerite-like substance was consistent with the location where the officer had previously seen the plume of white/grey smoke after CARROLL had shot.

17. Neither the GMC Yukon nor the black Ford Ranger were registered to anyone present. The black Ford Ranger pickup is registered to Donna L. Maas of Burien, Washington. One of the men at the scene indicated that the Ranger belonged to his friend

COMPLAINT / CARROLL, et al. - 10

who is currently in prison. That man gave verbal consent to the King County Sheriff's Deputy to search the vehicle, and signed a consent form.

18. The green GMC Yukon is registered to Tamara D. Hoots of Seattle, Washington. Another man at the scene indicated that the Yukon belongs to PARKS' girlfriend, and that PARKS had lent him (the other man) the Yukon because he had a driver's license. However, a General Motors key, physically consistent with GMC Yukon keys, was discovered on PARKS' person when he was searched.

19. Law enforcement at the scene conducted a search of the Ford Ranger and recovered firearms, ammunition, firearms accessories, suspected methamphetamine and methamphetamine paraphernalia. The firearms that were seized from the Ford Ranger included a Mauser 98 8mm rifle, a Sig Sauer .223 caliber assault rifle, the Taurus revolver, the Taurus .45 ACP semi-automatic pistol, a Hi-Point C9 9mm semi-automatic pistol, and a Norinco SKS 7.62mm assault rifle.

20. The Yukon was also searched for weapons and additional evidence of the crime. Law enforcement recovered firearms, firearms accessories and tactical gear consistent with firearms activities. The weapons that were seized from the green Yukon included the Smith and Wesson M&P 10 .308 caliber assault rifle and the Smith and Wesson M&P 15 .223 caliber assault rifle.

21. On Monday, April 1, 2013, Officer McIntosh went to work in the Ranger Station, and was advised that the office's front desk had received calls from PARKS and his girlfriend, Tamera Hoots, regarding the incident on March 30, 2012. PARKS left a voicemail message, which Officer McIntosh reviewed. In the message, PARKS identified himself and then complained about the incident, claiming that his due process rights were violated, and that the implying that the officers had stolen the firearms. At one point in the message, PARKS referred to the guns as "our guns," then quickly rephrased his sentence, using the words, "their guns." The voice on the message was consistent with Officer McIntosh's memory of PARKS' voice at the time of the arrest.

22. Officer McIntosh contacted Ms. Hoots by telephone, who claimed she had loaned the Yukon to one of the other men who was at the target shooting scene. She then claimed that some of the property seized belonged to her, including a digital woodland camouflage backpack, a bore sighting tool and what sounded like she referred to as an "Aryan necklace." In the background, Officer McIntosh could hear what appeared to be a man's voice feeding Ms. Hoots information and questions.

23. That same day, Officer McIntosh and Officer King went to the home of one of the men who had first told them about the unfriendly target shooters in the forest prior to the officers contacting the group. That witness stated that one of the men who was target shooting was wearing green clothing and described a hat that was consistent with a boonie style hat. This description was consistent with what PARKS was wearing at the time the officers had contacted the group; no other member of the group wore a boonie hat during the time the officers contacted them. The witness stated that the man with the boonie style hat was in possession of a long gun.

24. On Wednesday, April 3, 2013, Officer McIntosh received another voicemail from PARKS. In the message PARKS inquired about the property that was taken and again expressed his belief that his rights were violated. PARKS stated that the green, Blackhawk tactical vest was his. The Blackhawk tactical vest PARKS was referring to was seized from the GMC Yukon. The vest contains four plastic rifle magazine carriers and two "Fox Tactical" nylon rifle magazine pouches. The size of the carriers and pouches appears to be for .223 caliber rifle magazines. PARKS indicated in the message that he uses the magazine carriers for Air Soft gun magazines. Air Soft guns fire small, non-lethal plastic pellets. Law enforcement did not find any Air Soft guns in either vehicle during the searches of the vehicles.

25. On Thursday, April 11, 2013 Officer King and Officer McIntosh met with the witness who had described seeing the man wearing the boonie style hat holding a gun. Officer McIntosh showed the witness a photographic line-up to see if he could pick out the man he had previously described that matched PARKS' clothing description. The

1  witness was unable to identify PARKS as the man he had seen in the green and the
2  boonie hat. The witness stated that the man was also wearing sunglasses so it was
3  difficult to recognize him, and that the three men at the top of the line-up were "definitely
4  not him." The top three included PARKS.

5        26.    Next, Officer McIntosh showed the witness a photographic line-up of the
6  weapons seized from the scene to see if he could identify the firearm that the man
7  wearing the boonie style hat had been holding. The witness viewed photos of the eight
8  seized firearms. In doing so, he stated that he had not observed any handguns. He
9  indicated that firearm #4 (SKS) or #7 (Mauser) "could" have been the one.

10        27.    The witness then provided a statement, which Officer McIntosh typed in
11  non-verbatim fashion as he made it. The witness stated that on Saturday, March 30,
12  2013, he and his friends encountered some target shooters. He observed a man wearing a
13  green boonie hat, a longer green jacket, possibly green pants, and sunglasses and holding
14  a long gun with a long barrel and a scope. The witness stated that the man in the boonie
15  hat pointed at him and his friends and motioned for them to turn back down the road. He
16  and his friends left the area, and went down another main logging road, where they could
17  hear large caliber rifle fire and see back up the hill to where the group was shooting. The
18  witness stated that the group was shooting in their general direction so they decided to
19  leave the area entirely.

20  **THE DOC SEARCH OF CARROLL'S RESIDENCE**

21        28.    On April 8, 2013, Washington State Department of Corrections
22  (DOC) Community Corrections Specialists (CCS) Kristoffer Rongen and John Conaty
23  were seeking the arrest of CARROLL on an outstanding DOC warrant. CCS Rongen is
24  very familiar with CARROLL as he has arrested him on numerous past occasions
25  because CARROLL frequently fails to report to the DOC. CARROLL resides in Burien,
26  Washington, at an address that has been the address he has listed with DOC dating back
27  to at least 2007, when CCS Rongen started arresting him on DOC warrants. There are
28  two shops located on the property and CCS Rongen knows CARROLL to frequent these

locations. CARROLL lives with his brother Joby Carroll, his nephew JOSHUA, and his mother at the residence.

29. CCS Rongen and Conaty requested the assistance of the King County Sheriff's Office (KCSO) to arrest CARROLL. Deputies Gerald Meyer, Scott Fitchett and Adam Easterbrook joined CCSs Rongen and Conaty for the arrest, which was to take place at CARROLL's residence in Burien. Deputy Meyer and CCS Rongen went toward the shop located on the back of the property while the other deputies and specialist covered the rest of the home. While en route to the first shop on the property, CCS Rongen passed Joby Carroll and asked him if CARROLL was home. Joby stated he did not know, so CCS Rongen and Deputy Meyer continued toward the first shop closest to the house. The sliding door to the shop was open approximately 6 to 8 inches and CCS Rongen announced, "Greg, DOC/Police!" CARROLL responded by saying he was coming out, and did so a short time later, and was taken into custody without incident.

30. Once CARROLL was in custody, he seemed overly anxious to leave and go to jail. CCS Rongen found this odd and felt CARROLL may have hid some narcotics prior to coming out. CARROLL is currently on supervision with the DOC for possession of methamphetamines, and is also known to CCS Rongen as a methamphetamine user. CCS Rongen went into the area inside the shop where he observed CARROLL prior to CARROLL exiting the shop to search for any further probation violations. Once CCS Rongen got to that area, he immediately saw shotgun shells sitting in plain view on a shelf. CCS Rongen then noticed a box of .22 caliber ammunition sitting next to a computer on the work bench. No one else was inside the shop. The computer was turned on, indicating CARROLL was most likely working on the computer right next to where the .22 caliber ammunition was located. CCS Rongen informed Deputy Meyer he had located ammunition and was concerned CARROLL may be in possession of a firearm. Since CARROLL is a convicted felon and is on active DOC supervision, he is prohibited from possessing firearms and ammunition, and is subject to arrest, search, and seizure under DOC authority.

31. CCS Rongen requested that Deputy Meyer notify the rest of the arrest team that CARROLL was in custody, and requested their assistance in searching the shop for any further DOC violations, specifically firearms and ammunition, under DOC authority. Joby Carroll was detained for officer safety pending further investigation by the deputies and specialists. Deputy Fitchett then read both Joby and GREG CARROLL their *Miranda* rights, which was witnessed by CCS Rongen.

32. DOC Specialists and KCSO Deputies searched the two shops located at CARROLL'S residence. A total of nine firearms were located within the shops, along with several thousand rounds of ammunition ranging from .22 caliber to .300 magnum. Also located during the search was a ballistic plate carrier vest with plates inside it, with three additional steel ballistic plates, and ammunition reloading supplies. The specific firearms recovered are as follows:

   a. Marlin, model 882 SS, .22 Winchester Magnum caliber bolt action rifle
   b. Remington, model Nylon 66, .22 caliber semi-automatic rifle
   c. Rock Island Arsenal, model 1903, .30 caliber rifle
   d. Savage Arms, Stevens, model 67, series E, 12 gauge shotgun
   e. Stevens, Wards Western Field Deluxe, model SB 530, 12 gauge double barrel shotgun with a 15 ½" barrel length
   f. Remington, auto loading shotgun with a 15 ¾" barrel length
   g. Harrington and Richardson, model Topper 88, .410 gauge, single shot shotgun with a 9 ¾" barrel length
   h. Iver Johnson, Marswells, single shot shotgun with a 10 7/16" barrel length
   i. Browning, model BL-22, .22 caliber lever action rifle.

33. Both Joby and GREG CARROLL were present during the search. When CCS Rongen located the Browning .22 caliber lever action rifle, Joby informed CCS Rongen that was his rifle. CCS Rongen asked Joby if he had any felony or domestic violence related convictions and Joby replied he did not have any such convictions. Joby denied

ownership of any of the other weapons that were located in the shops. He told CCS Rongen that he did not know who they belonged to and had no further information regarding the weapons located in the shops.

34. Throughout the search CCS Rongen located several safes with various types of locks. In the second shop located on the property, CCS Rongen located a large blue free standing safe with pad locks. CARROLL said this safe belonged to his friend Kevin. CARROLL was able to provide CCS Rongen with the location of the key for the locks on the safe. Inside the safe, CCS Rongen located the Marlin Arms .22 caliber bolt action rifle listed above. The rifle was loaded with one round in the chamber and a fully loaded magazine. CARROLL stated the safe, and all of the firearms belonged to his friend Kevin. Kevin was identified by CCS Rongen as Kevin L. Maas. CCS Rongen is familiar with Maas as he has arrested him before at CARROLL'S residence. Maas is a convicted sex offender and is currently serving time in Twin Rivers Correctional Center. CARROLL went on to say that he was storing the safe and firearms for Maas while he is in prison.

35. During the search, CCS Rongen located another safe with a combination lock, in the same shop where CARROLL was found. CARROLL said this safe also belonged to Kevin Maas, but was able to provide CCS Rongen with the combination to open it. Once the safe was opened, CCS Rongen found a mason jar that contained suspected crushed/ground marijuana in it. Also located in the safe were two containers with ammunition, along with numerous other boxes of ammunition.

36. CCS Conaty located the short barreled Harrington and Richardson single shot 410 gauge shotgun in the room where CARROLL had initially been seen by CCS Rongen. The shotgun was hanging up in a holster and was loaded with additional rounds in the holster. CCS Conaty located the shotgun hanging up by the holster and was covered by CARROLL'S jacket. CCS Conaty had offered the jacket to CARROLL prior to leaving the residence to transport CARROLL to jail. CARROLL declined to take the jacket with him, but confirmed the jacket belonged to him.

37. CCS Rongen asked CARROLL if all of the firearms, ammunition, ballistic plates, etc. all belonged to Kevin. CARROLL then started to tell CCS Rongen about an individual named Frank. CARROLL initially told CCS Rongen that Frank, along with Kevin's girlfriend, brought all of the weapons and ammunition to his shop. CARROLL could not provide CCS Rongen with a name for Kevin's girlfriend, nor did he know Kevin's last name. CCS Rongen then overheard CARROLL'S mother asking CARROLL how all of this could happen. CARROLL responded to his mother by saying, "I was around it. I was a dumbass for allowing him to leave it. I was supposed to have sold this shit (referring to the firearms)." Later, while on the ride to jail, CARROLL admitted to CCSs Rongen and Conaty that there was no individual named Frank and CARROLL had lied about his existence.

## CARROLL'S STATUS AS A FELON

38. I have reviewed court documents from King and Pierce County Superior Courts in the State of Washington, and those documents establish that GREG ALAN CARROLL has been convicted of the following crimes punishable by imprisonment for a term exceeding one year:

   a.  Violation of the Uniform Controlled Substance Act, under cause number 07-1-07802-5, in King County Superior Court, Washington, on December 16, 2008;

   b.  Assault in the Third Degree (count I) and Unlawful Possession of a Firearm in the Second Degree (count II), under cause number 05-1-01431-0, in Pierce County Superior Court, Washington, on September 1, 2005.

## PARKS' STATUS AS A FELON

39. I have reviewed JOHN CHRISTIAN PARKS' criminal history as reported by the Washington State Patrol Identification and Criminal History Section. That printout reveals that JOHN CHRISTIAN PARKS has been convicted of the following crimes punishable by imprisonment for a term exceeding one year:

a. Violation of the Uniform Controlled Substances Act – Possesession, under cause number 03-1-03013-5, in King County Superior Court, Washington, on May 21, 2004;

b. Escape in the Second Degree, under cause number 04-1-12909-1, in King County Superior Court, Washington, on December 20, 2004;

c. Violation of the Uniform Controlled Substances Act – Manufacture, Deliver, Possession with Intent, under cause number 01-1-06630-9, in Pierce County Superior Court, Washington, on May 17, 2005;

d. Violation of the Uniform Controlled Substances Act – Possession, under cause number 01-1-00040-9, in Jefferson County Superior Court, Washington, on May 4, 2001;

e. Violation of the Uniform Controlled Substances Act – Possession, under cause number 01-1-04671-0, in King County Superior Court, Washington, on September 28, 2001;

f. Violation of the Uniform Controlled Substances Act – Possession, under cause number 00-1-00477-2, in Grant County Superior Court, Washington, on February 6, 2001;

g. Violation of the Uniform Controlled Substances Act – Manufacture, Deliver, Possession with Intent, under cause number 97-1-00284-1, in Clallam Couinty Superior Court, Washington, on April 2, 1998; and

h. Violation of the Uniform Controlled Substances Act – Possession with Intent, under cause number 97-1-00284-1, in Clallam Couinty Superior Court, Washington, on April 2, 1998.

## JOSHUA'S STATUS AS A FELON

40. I have reviewed court documents from King County Superior Court in the State of Washington, and those documents establish that JOSHUA DEE CARROLL has been convicted of the following crime punishable by imprisonment for a term exceeding one year:

    a. Assault in the Third Degree, under cause number 09-1-05462-9, in King County Superior Court, Washington, on November 2, 2009.

## INTERSTATE NEXUS

41. I have spoken with Joseph Bisbee, who works for the ATF and is also an expert in the field of interstate nexus for the ATF. He has advised me that none of the firearms mentioned above were manufactured in Washington state, meaning that each of them had traveled in interstate or foreign commerce prior to CARROLL, PARKS, and JOSHUA possessing them.

## CONCLUSION

42. Based on the foregoing, I submit that there is probable cause to believe that GREG ALAN CARROLL, JOHN CHRISTIAN PARKS, and JOSHUA DEE CARROLL have committed the crime of Felon in Possession of Firearms, in violation of Title 18, United States Code, Section 922, et. seq.

                                          RYAN J. KOWALCHUK, Complainant
                                          TFO, ATF

Based on the Complaint and Affidavit sworn to before me, and subscribed in my presence, the Court hereby finds that there is probable cause to believe the Defendants committed the offenses set forth in the Complaint.

Dated this __17__ day of MAY, 2013.

*[signature]*

THE HONORABLE MARY ALICE THEILER
United States Magistrate Judge